### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| DOROTHY RENEE JACKSON,<br><br>    Plaintiff,<br><br>    v.<br><br>JTM CAPITAL MANAGEMENT, LLC,<br>WEINBERG MEDIATION GROUP LLC and<br>ROYAL ASSET MANAGEMENT, INC.,<br><br>    Defendants. | Civil Action No. TDC-19-1009 |

### MEMORANDUM OPINION

In this civil action, Plaintiff Dorothy Renee Jackson alleges that three entities allegedly involved in efforts to collect on her consumer debts violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p (2018); the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14-201–14-204 (LexisNexis 2013); and the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101–13-501d.  Presently pending before the Court is a Motion for Summary Judgment filed by Defendant JTM Capital Management, LLC ("JTM"), as well as JTM's Interim Motion to Seal certain documents contained in the joint record submitted with the Motion for Summary Judgment.  Having reviewed the pleadings, briefs, and submitted materials, the Court finds no hearing necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, the Motion to Seal will be GRANTED IN PART and DENIED IN PART, and the Motion for Summary Judgment will be DENIED.

**BACKGROUND**

**I.    JTM and its Collection Agencies**

JTM is in the business of purchasing debts from originating creditors in order to collect on those debts. At all relevant times, JTM was a licensed "collection agency" in the State of Maryland. Md. Code. Ann., Bus. Reg. § 7–101(d) (LexisNexis 2015). As of 2018, JTM derived the vast majority of its income from the collection of debts. However, JTM does not take direct action to collect on the debts it acquires. Rather, JTM contracts with other collection agencies or specialists to contact debtors in order to collect on those debts.

On July 7, 2017, JTM entered into a Collection Services Agreement ("CSA") with Defendant Weinberg Mediation Group LLC ("Weinberg") under which Weinberg would collect debts on accounts placed with Weinberg by JTM. On August 8, 2018, JTM entered into a separate CSA with Defendant Royal Asset Management, Inc. ("RAM") under which RAM would collect debts on accounts placed with RAM by JTM.

Under the CSAs, Weinberg and RAM (together, "the collection agencies") agreed that they would "undertake the collection" of debts on accounts that JTM had placed with them "for the purpose of collection," and that they would "use due diligence, best efforts and to employ such lawful means, methods and procedures" which, "in its reasonable judgment, it believes will best effect the collection" of such debts. Joint Record ("J.R.") 213, 233, ECF No. 75. The CSAs also state that the collection agencies are contractually obligated to adhere to certain JTM requirements, including that they: (1) perform all of their obligations under the relevant CSA pursuant to JTM's Third Party Agency Manual ("the JTM Agency Manual"); (2) record 100 percent of their calls with consumers and retain those recordings for a minimum of two years following the closure of any account; (3) produce, upon request, all call recordings in a format that is searchable by date,

2

time, account number, telephone number called, the telephone used to place the call as reflected by caller identification data, and the employee who placed the call; and (4) submit to JTM, for approval prior to use, all written communications and call scripts used or intended for use with consumers.

The CSAs further provide a specific procedure by which the collection agencies are required, in a timely manner, to investigate written or oral consumer complaints and to report them to JTM. Once a complaint is received, the collection agency must suspend all collection activity and may not respond to the complaint without JTM's prior written approval. Finally, the CSAs provide JTM with general rights of inspection such that "at any time and from time to time," the collection agencies must permit JTM or its designated representatives to "examine or make copies or abstracts from all books, records and documents in any way relating to any account or the [collection agency's] collection activities" and "visit the offices and properties of the [collection agency] for purposes of examining such materials or . . . procedures, processes, and activities relating to the exercise of its duties" under the contract. J.R. 219, 239.

Despite these contractual provisions, the CSAs state that they "shall not be construed as creating an employee/employer, agency, partnership, or joint venture relationship between" JTM and the collection agency, and that "[e]ach party shall be responsible to supervise, manage, contract, direct, procure, perform or cause to be performed, all its obligations under this Agreement and shall be liable for all acts or omissions of its employees or agents in performing its respective obligations hereunder." J.R. 228, 248.

Beyond the CSAs, JTM has put in place other means by which to control and monitor the activities of the collection agencies. As stated in the JTM Agency Manual, collection agencies such as Weinberg and RAM are required to have their employees pass an examination regarding

3

consumer communications and to provide copies of their training materials, examinations, and results logs annually or upon request to JTM. The JTM Agency Manual also provides specific and extensive guidelines and restrictions applicable to telephone and written communications with consumers. Relatedly, JTM requires collection agencies to respond to Third Party Compliance Questionnaires ("the Third Party Questionnaires") which seek information and backup documentation about their organizational structure, their internal controls to ensure compliance with legal requirements and policies, and perhaps most importantly, their specific policies and procedures for conducting collection calls, including those relating to the time and place of their communications with consumers, and their restrictions on the use of false, deceptive, or misleading communications.

Michael Hyla, JTM's Vice President of Compliance, has acknowledged that JTM can and does take steps to monitor the collection agencies' compliance with legal requirements, including performing monthly audits of calls, receiving weekly or monthly reports, having the ability to listen in on phone calls made by collection agency personnel to consumers, and requiring participation in certain trainings. Finally, if JTM finds through these monitoring tools that a collection agency does not comply with legal requirements, it has a "myriad of remediation" options. J.R. 90. Nevertheless, Hyla has claimed that JTM has "no control over" the actions of Weinberg and RAM. *Id.*

## II.     Collection Activities

On May 30, 2017, JTM acquired two debts owed by Jackson to Mid America Bank and Trust as part of two separate portfolios of accounts purchased by JTM. In February 2018, JTM placed one of Jackson's debts with Weinberg and the other with RAM for collection purposes. At the time, neither Weinberg nor RAM had a license to operate as a collection agency in Maryland.

4

Beginning in March 2018, Jackson began receiving phone calls on behalf of JTM at her place of work and on her cellphone.  Over the next two to three months, multiple individuals called Jackson several times a day attempting to collect on the debts she owed.  According to Jackson, these calls were "bullying" and caused her emotional distress because the debt collectors were contacting Jackson while she was at work as an administrative secretary at a public school in Montgomery County, Maryland, and threatened that if she did not pay off her debts, the collectors would come to the school, talk to her employer, and serve her with a warrant for "malicious theft."  J.R. 355, 367.  Jackson feared that the debt collectors would follow through on their specific threats and that she would lose her job.  On at least one occasion, an individual contacted Jackson's daughter on the phone in an effort to collect on one of the debts.

The parties do not dispute that JTM personnel did not place any telephone calls, send letters, or otherwise attempt to communicate directly with Jackson about her debts.

### III.  Procedural History

On March 1, 2019, Jackson filed the original Complaint in this case in the Circuit Court for Montgomery County, Maryland.  Defendants removed this case to this Court on April 4, 2019.  In the Complaint, Jackson alleges that Defendants violated 15 U.S.C. § 1692e, a provision of the FDCPA which provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," by threatening to file criminal charges against her, falsely implying that Jackson committed a crime for which charges could be filed, and revealing information about the debts in the call to Jackson's daughter and on voice mails with Jackson's employer.  Jackson also alleges that this same conduct violated the MCDCA, under which a "collector" may not "[t]hreaten criminal prosecution," "contact a person's employer with respect to a delinquent indebtedness" before final judgment, disclose "information

which affects the debtor's reputation" to a third party, or engage in other prohibited conduct. Md. Code Ann., Com. Law, § 14-202. Finally, Jackson alleges a violation of the MPCA, which provides that a violation of the MCDCA is also a violation of the MPCA. *Id.* § 13-301(14)(iii).

## DISCUSSION

### I. Motion to Seal

The Court first addresses JTM's Interim Motion to Seal certain portions of the joint record submitted with the Motion for Summary Judgment on the grounds that they contain "sensitive confidential financial and business information." Mot. Seal at 1, ECF No. 74-1. The documents at issue include: (1) the JTM Agency Manual; (2) the Third Party Questionnaires; (3) JTM's profit and loss statement; (4) JTM's New Placement Acknowledgment Forms, used to document the placement of a debt with one of the collection agencies; (5) JTM's "ComplyARM Complaint Report" ("the Complaint Report"), which documents consumer complaints; (6) Jackson's credit report; and (7) portions of the transcript of Hyla's deposition that reference these documents (collectively "the Sealed Materials"). Jackson does not oppose the sealing of any of these documents other than the portions of Hyla's deposition transcript.

#### A. Legal Standard

The public generally has a right of access to court records because "[p]ublicity of such records . . . is necessary in the long run so that the public can judge the product of the courts in a given case." *Columbus–America Discovery Grp. v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 303 (4th Cir. 2000). This right of access derives from two independent sources: the First Amendment to the United States Constitution and the common law. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988). Under either source, "the public's right of access to judicial records and documents may be abrogated only in unusual circumstances." *Id.* at 182.

The United States Court of Appeals for the Fourth Circuit has recognized that "the more rigorous First Amendment standard" applies "to documents filed in connection with a summary judgment motion in a civil case," as "summary judgment adjudicates substantive rights and serves as a substitute for a trial." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252-53 (4th Cir. 1988). A court may restrict access to proceedings and filings subject to the First Amendment right "only on the basis of a compelling . . . interest, and only if the denial is narrowly tailored to serve that interest." *Stone*, 855 F.2d at 180. The burden to overcome the First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position. *See Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 7, 15 (1986).

### B.   Specific Documents

The Court agrees that JTM's profit and loss statement and Jackson's credit report are properly sealed because they contain sensitive financial information that is "tangential to the merits . . . before the court." *Stratagene v. Invitrogen Corp.*, 206 F.R.D. 121, 122 (D. Md. 2002); *see Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (sealing documents produced under a protective order that contained "confidential, proprietary, commercial, or financial data"); *Randolph v. ADT Sec. Servs., Inc.*, No. DKC-09-cv-1790, 2012 WL 2234362, at *11 (D. Md. June 14, 2012) (sealing documents containing personal financial data).

As for the JTM Agency Manual, the Third Party Questionnaires, and the New Placement Acknowledgment Forms, JTM argues that they should be sealed because public access to these documents would reveal to its competitors its internal policies and procedures, compliance requirements, and strategies and policies. Because disclosure of such information could "result in a competitive disadvantage," there is a basis to seal them. *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 123 (D. Md. 2009). As discussed below, however, certain details from these

documents are highly relevant to the resolution of the pending Motion for Summary Judgment because they establish the degree to which JTM maintains control over its contractor collection agencies, an issue germane to the question whether JTM may be held liable for the actions of Weinberg and RAM. Upon consideration of these competing interests, the Court finds that, to the extent that it refers to specific information contained in those documents in this opinion, it does so because such references are necessary to the resolution of this dispositive motion, and the First Amendment right of public access requires that such facts remain available to the public. *See Rushford*, 846 F.2d at 252-53. The Court therefore will not seal any part of this opinion that quotes from or references these documents. However, because any other information is not specifically necessary to the resolution of the Motion for Summary Judgment, there is a legitimate interest in protecting confidential business information contained in these documents, and there is no opposition to sealing, the Court will seal the specific exhibits as filed with the Motion for Summary Judgment. *See Pittston*, 368 F.3d at 406; *Stratagene*, 206 at 12. At this time, the Court need not, and does not, address whether they may remain sealed if needed for use at trial.

The Court will not, however, seal the Complaint Report, which simply lists limited data relating to complaints about JTM, Weinberg, and RAM, without revealing any particular proprietary business techniques or strategies. Where the question of whether Weinberg and RAM engaged in unlawful debt collection practices, and whether JTM had the ability to control whether they engaged in such activities, is central to the claims in this case, the information about such complaints is relevant to the Court's resolution of the Motion for Summary Judgment and should not be shielded from the public. Against this public interest, JTM's only stated interest in sealing the Complaint Report is to avoid "harm [to] JTM's reputation and standing in its industry." Mot. Seal at 9. Standing alone, an "urge for secrecy is incompatible with the public resolution of

business disputes in our open judicial system," and the fact that disclosure or use of that information "in litigation is arguably detrimental to the financial or business interests of a party" does not render it "the type of sensitive business information . . . that courts shield." *Minter*, 258 F.R.D. at 124. The Court will therefore deny the Motion to Seal as to the Complaint Report, but it will allow the redaction from the Complaint Report of the names and account numbers of individual consumers.

Finally, JTM argues that certain portions of Hyla's deposition transcript that reference the JTM Agency Manual, the Third Party Questionnaires, the Complaint Report, and JTM's profit and loss statement must be sealed because those portions of the testimony "directly reference, explain, or interpret" confidential business documents. Mot. Seal at 9. Upon reviewing the proposed redactions, however, the Court finds that the testimony itself does not contain or reference confidential or proprietary parts of these documents. For example, in discussing the JTM Agency Manual, Hyla testified about whether it was given to every collection agency, who developed it, whether it was in effect during the relevant time period, and where the document was located on JTM's computer systems, without addressing its substantive contents. Similarly, in addressing the Third Party Questionnaires, Hyla responded to general questions about how parties filling out the form might submit documentation requested by the form, and how JTM interprets responses or lack of responses by collection agencies, without discussing the substance of the responses. The discussion of the other documents at issue similarly reveals no significant proprietary information. Thus, where the portions of the deposition testimony are limited to providing general context relating to certain documents without discussing their contents, JTM has not offered a compelling interest that would override the First Amendment public right of access. *See Stone*, 855 F.2d at 180. The Court will deny the Motion to Seal as to the deposition transcript.

## II. Motion for Summary Judgment

In its Motion for Summary Judgment, JTM argues that Jackson's FDCPA claims against it fail because it is not a "debt collector" as defined in that statute. 15 U.S.C. § 1692a(6). Similarly, JTM argues that it is not liable under the MCDCA as it does not qualify as a "collector" under the statute. Md. Code Ann., Com. Law § 14-201. Where Jackson's theory of liability under the MCPA relies on JTM's alleged violation of the MCDCA, JTM further argues it cannot be liable if it is not a "collector" under the MCDCA. Finally, JTM argues that regardless of whether it meets one these statutory definitions, it cannot be held vicariously liable for the actions of Weinberg or RAM.

### A. Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B. FDCPA

The FDCPA's essential purpose is to prevent "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692(a), by prohibiting debt collectors "from making false or

misleading representations and from engaging in various abusive and unfair practices," *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995) (internal citation omitted). As relevant here, Jackson alleges that JTM violated 15 U.S.C. § 1692e, which provides that "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt" by: (1) making a "threat to take any action that cannot legally be taken," *id.* § 1692e(5); (2) making a "false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer," *id.* § 1692e(7); and (3) engaging in the "use of any false representation or deceptive means to collect . . . any debt or obtain information concerning a consumer," *id.* § 1692e(10).

Under the statutory language, in order to be held liable, JTM must qualify as a "debt collector" as defined by the FDCPA. *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th Cir. 2012); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012). The FDCPA defines a "debt collector" as any person "who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts," or "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The parties disagree as to whether JTM qualifies as a "debt collector" under either the first part of this definition, which is referred to as the "principal purpose" prong, or under the second part of this definition, which is referred to as the "regularly collects" prong.

In *Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718 (2017), the United States Supreme Court provided guidance on the meaning of the "regularly collects" prong, specifically the language defining as a debt collector anyone who "regularly collects or attempts to collect . . . debts owed or due . . . another." *Id.* at 1721. In addressing "how to classify individuals and entities

11

who regularly purchase debts originated by someone else and then seek to collect those debts for their own account," the Court found that the "plain terms" of the "regularly collects" prong focuses on "third party collection agents working for a debt owner—not on a debt owner seeking to collect debts for itself." *Id.*  The Court further clarified that the language does not appear to "care how a debt owner came to be a debt owner—whether the owner originated the debt or came by it only through a later purchase." *Id.*  Rather, "[a]ll that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for 'another.'" *Id.* at 1721–22. Therefore, the Court concluded that an entity which had purchased debt originated by another company and then sought to collect "for its own account" could do so without triggering the "regularly collects" prong part of the definition of "debt collector." *Id.*

Here, JTM correctly argues that it fits the scenario described in *Henson*:  while it "is in the business of purchasing debts from originating creditors" and acquired Jackson's debts in this manner, Joint Statement of Undisputed Facts ("JSUF") ¶ 1, ECF No. 70, when it seeks to collect on those debts, whether on its own or through the collection agencies, it does so "for its own account" and thus not does not fall within this part of the definition of a "debt collector." *See Henson*, 137 S. Ct. at 1721-22.  The Court agrees with JTM that under *Henson*, it is not a debt collector under the "regularly collects" prong of the definition.

Jackson, however, argues that this is only half of the story.  In *Henson*, the Supreme Court specifically declined to resolve the issue of whether an entity which regularly purchases debts and seeks to collect on those debts for its own accounts, such as JTM, would qualify as a "debt collector" under the "principal purpose" prong of the FDCPA definition. *Id.* at 1721.  Several United States Courts of Appeals, however, have recently analyzed this issue of whether such an entity can still qualify as a debt collector under the "principal purpose" prong even it relies on third

parties to conduct the actual debt collection. In *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260 (3d Cir. 2019), the United States Court of Appeals for the Third Circuit found that the definitional phrase "any business the principal purpose of which is the collection of any debts" sweeps broadly and thus includes a business which "buys consumer debt and hires debt collectors to collect on it." *Id.* at 267-68. After engaging in a detailed textual analysis to distinguish the "principal purpose" prong from the "regularly collects" prong and reasoning that "[t]he existence of a middleman does not change the essential nature" of the business, the Third Circuit held that such an entity can qualify as a debt collector under the "principal purpose" prong of the definition despite hiring third parties to engage in the actual collection of the debt. *Id.* at 268. In *McAdory v. M.N.S. & Associates, LLC*, 952 F.3d 1089 (9th Cir. 2020), the United States Court of Appeals for the Ninth Circuit reached the same conclusion and provided further guidance on the "principal purpose" prong, finding that it "describes the *type* of business Congress sought to regulate—i.e., one with a principal purpose of debt collection" and thus provides a distinct means of qualifying as a debt collector unconnected to the "regularly collects" prong. *Id.* at 1094. Citing both *Barbato* and *McAdory*, the United States Court of Appeals for the Eighth Circuit has similarly concluded that an entity whose "primary objective is to collect on debt accounts it purchased in order to turn a profit" and hired a debt collection agency to actually collect the debts was a "debt collector" under the "principal purpose" prong. *Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119, 1125 (8th Cir. 2020). Citing *Barbato*, another judge in this District has likewise concluded that a business could qualify as a "debt collector" under the "principal purpose" prong even if it engages third parties to collect the debt. *Long v. Pendrick Cap. Partners II, LLC*, 374 F. Supp. 3d 515, 536 (D. Md. 2019) ("[T]his Court fails to see why outsourcing collection matters would change the debt buyer's principal business purpose."). The Court finds the reasoning and conclusions of *Barbato*,

13

*McAdory*, and *Reygadas* persuasive and likewise concludes that a business such as JTM qualifies as a debt collector.

In the face of such persuasive authority, JTM argues, based on *Washington v. Weinberg*, 478 F. Supp. 3d 966 (N.D. Ohio 2020), that JTM cannot qualify as a "debt collector" because it is also a creditor. *Id.* at 968-69. That conclusion, however, is incompatible with the analysis of *Barbato* and the other circuit case law. *See, e.g. Barbato*, 916 F.3d at 267-68. More importantly, the plain language of the statute does not exclude a creditor from the definition of "debt collector." *See* 15 U.S.C. § 1692a(6). Instead, it excludes only "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." *Id.* § 1692a(6)(A).

Finally, the Court notes that the FDCPA is a remedial statute. *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 393 (4th Cir. 2014). For such statutes, courts must adopt a "standard of liberal construction in order to accomplish Congress' objects." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987). Where the plain language of the statute reveals that the "principal purpose" prong was intended to include within the definition of "debt collector" a category of entities distinct from those covered by the "regularly collects" prong, specifically, businesses focused on debt collection even if through the use of third party collection agencies, the Court finds that JTM qualifies as a "debt collector" under the "principal purpose" prong and cannot evade FDCPA liability simply by outsourcing the specific collection activities to third parties. The Court will therefore deny JTM's Motion on the issue of whether the business qualifies as a debt collector under the FDCPA.

    **C.**    **MCDCA and MCPA**

The MCDCA provides a state law cause of action for damages to enforce prohibitions on certain conduct in the course of debt collection relating to consumer transactions. Md. Code Ann.,

Com. Law §§ 14-201 to 14-203.  As relevant to Jackson's claim, the MCDCA provides that "[i]n collecting or attempting to collect an alleged debt a collector may not . . . threaten criminal prosecution," "contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor," "disclose or threaten to disclose to a person other than the debtor or his spouse . . . information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information," or "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."  *Id.* § 14-202(2), (4), (5), (8).  The MCPA provides that a violation of the MCDCA is an "[u]nfair, abusive, or deceptive trade practice[]" that also violates the MCPA.  Md. Code Ann., Com. Law § 13-301(14)(iii).  Accordingly, the two counts can be analyzed together.

The relevant provisions of the MCDCA apply only to the actions of a "collector," which is defined broadly as a "person collecting or attempting to collect an alleged debt arising out of a consumer transaction."  Md. Code Ann., Com. Law § 14-201(b).  This language is significantly more expansive than the definition of a "debt collector" under the FDCPA.  *See id.*; *Aghazu v. Severn Sav. Bank, FSB*, No. PJM-15-cv-1529, 2017 WL 1020828, at *8 n.21 (D. Md. Mar. 16, 2017) ("The point is that the MCDCA applies more broadly than the FDCPA.").

JTM does not dispute that Jackson's debts were consumer debts.  While JTM argues that it does not itself, or through in-house debt collectors, undertake any actions to collect Jackson's debts, the definition of "collector" is not limited only to persons or entities that directly engage with consumers to collect the debt.  Md. Code Ann., Com. Law § 14-201(b); *see Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 458, 463-64 (D. Md. 2013) (finding that defendant Chase Bank was a covered "collector" under the MCDCA even when the actions alleged

to violate the statute were conducted by a substitute trustee on behalf of Chase Bank). The Court will therefore deny the Motion as to the argument that JTM is not a "collector" under the MCDCA.

In turn, since Jackson's MCPA claim is based in part on JTM's alleged violation of the MCDCA, JTM's argument relating to the definition of "collector" provides no basis to grant summary judgment on Jackson's MCPA claim. *See* Md. Code Ann., Com. Law § 13-301(14)(iii).

### D.     Vicarious Liability

JTM further argues that it cannot be held liable because it did not directly communicate with Jackson and cannot be held vicariously liable for the actions of Weinberg and RAM.

Because JTM meets the definitions of a "debt collector" under the FDCPA and a "collector" under the MCDCA, *see supra* parts II.B, II.C., it could be subject to vicarious liability. *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000) (stating that an entity "which itself meets the definition of 'debt collector' may be held vicariously liable for unlawful collection activities carried out by another on its behalf"), *abrogated on other grounds by Tepper v. Amos Financial, LLC*, 898 F.3d 364 (3d Cir 2018); *Long*, 374 F. Supp. 3d at 534 (holding that a defendant may be subject to vicarious liability under the FDCPA if it meets the definition of a "debt collector"); *Fontell v. Hassett*, 870 F. Supp. 2d 395, 412 (D. Md. 2012) (same). In order to establish vicarious liability, even in the absence of an employer-employee relationship, there must be a principal-agent relationship. *Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals . . . vicariously liable for acts of their agents. . . ."). "An agency relationship exists when a principal manifests assent to an agent that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659-60 (4th Cir. 2019) (citations omitted). "Generally, the existence and scope of agency

relationships are factual matters and are therefore often appropriately left to the jury." *Id.* at 660 (citations omitted).

JTM argues that even though it entered into contracts with Weinberg and RAM to provide debt collection services, JTM did not retain control over, or the right to control, the collection agencies' activities. JTM focuses on the language of the CSAs, which expressly states that the agreements do not create agency relationships. This provision, though "highly relevant," is not dispositive. *Id.* at 661 (stating that "[a]t no time, however, have we suggested that a contractual disclaimer was alone dispositive" in determining whether a principal-agent relationship exists). JTM also notes that the CSAs vest the collection agencies with the authority to use their "reasonable judgment" to employ "such lawful means, methods and procedures" to "best effect the collection" of debt accounts. J.R. 213, 233. Lastly, JTM points to the deposition testimony of Hyla, who stated that JTM "had no control" over the collection agencies' actions. J.R. 90.

The record, however, contains sufficient evidence to create a genuine dispute of material fact whether Weinberg and RAM were "subject to the principal's control" in conducting their debt collection activities on behalf of JTM, such that JTM could be vicariously liable for their unlawful actions. *Krakauer*, 925 F.3d at 660. The CSAs provide that Weinberg and RAM were required to keep recordings of its calls to consumers and had to submit for approval all written communications and call transcripts used in their debt collection activities. The CSAs also allow JTM to exercise a great degree of control over consumer complaints made to the collection agencies, to the point that the collection agency is not allowed to respond to the consumer without prior written approval from JTM. The CSAs further provide JTM with general "rights of inspection" such that "[a]t any time and from time to time," Weinberg and RAM must permit JTM or its designated representatives to "examine or make copies or abstracts from all books, records

and documents in any way relating to any account or the [collection agency's] collection activities," as well as to "visit the offices and properties of the [collection agency] for purposes of examining such materials or . . . procedures, processes, and activities relating to the exercise of its duties" under the contract. J.R. 219, 239.

This degree of oversight and control is similarly reflected in the JTM Agency Manual, in which JTM has set forth specific requirements for various areas of activity, including regulatory compliance, compliance management, communications, privacy and information sharing, and consumer complaints. For instance, employees of collection agencies are required to pass an examination on consumer communications, and the collection agencies must provide copies of training materials, exams, and results logs annually or upon request to JTM. The JTM Agency Manual also includes specific and extensive restrictions on the timing and frequency of telephone and written communications, the use of automatic dialer systems, making calls to consumers known to be represented by an attorney, contacting third parties about debt collection, and "engaging in conversations repeatedly or continuously with the intent to annoy, abuse, or harass." J.R. 263-64. Finally, the JTM Agency Manual also imposes specific rules on capturing, resolving, and monitoring consumer complaints in whatever form they exist.

Similarly, through the Third Party Questionnaires, JTM has required that the collection agencies submit detailed responses and documentation about their operations and activities, including information about their organizational structure, the time and place of their communications with consumers, how they disclose the identity of the debt collector, their limitations on communications about debts with third parties, and the ways that they prevent false, deceptive, or misleading communications. These forms support the conclusion that JTM exercised significant control over the debt collection activities of Weinberg and RAM.

Finally, there is evidence that JTM, in fact, exercised this level of control over the collection agencies. Hyla testified that JTM had the ability to, and did, review the work of Weinberg and RAM, such as through monthly audits in which it pulled and listened to consumer phone calls. He further testified that when a business is found to be non-compliant with contractual or legal obligations, JTM is able to pursue remediation and, in some cases, has terminated business relationships based on these grounds.

As the Fourth Circuit has stated, "[i]f the parties want the benefits of an independent contractor relationship, they have to actually have one." *Krakauer*, 925 F.3d at 661. In *Krakauer*, an individual brought suit against Dish Network ("Dish") alleging that a sales representative was violating the Telephone Consumer Protection Act ("TCPA") aimed at preventing abusive telephone marketing practices. *Id.* at 648. Under the TCPA, Dish was vicariously liable for calls made by its agents, and thus a key question was whether its sale representative, Satellite Systems Network ("SSN") was in fact in a principal-agency relationship with Dish. *Id.* at 659. The Fourth Circuit found that, at trial, sufficient evidence had been presented to the jury supporting an agency relationship between Dish and SSN, including that "many provisions of the contract between Dish and SSN afford[ed] Dish broad authority over SSN's business, including what technology it used and what records it retained." *Id.* at 660. Thus, in finding that Dish actually had exerted substantial control over its subcontractor to the point that it was vicariously liable, the court stated that "the law does not permit" a company to "exercise extensive control over" the conduct of its subcontractor "without taking on responsibility for that conduct." *Id.* at 661. Where there is significant evidence that JTM could and did exercise substantial control over the activities of Weinberg and RAM through their contractual agreement, the JTM Agency Manual, the Third Party Questionnaires, and the actual activities of JTM personnel, and such control extended to authority

over the specific debt collection activities at issue in this case, there is, at a minimum, a genuine issue of material fact whether JTM, in fact, had principal-agent relationships with Weinberg and RAM that subject it to vicarious liability. The Court will therefore deny JTM's Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, JTM's Interim Motion to Seal will be GRANTED IN PART and DENIED IN PART, and JTM's Motion for Summary Judgment will be DENIED. A separate Order shall issue.

Date: April 2, 2021

   /s/ *Theodore D. Chuang*
THEODORE D. CHUANG
United States District Judge